# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ROANOKE DIVISION

| | | |
|---|---|---|
| **CARL D. GORDON,** | ) | Civil Action No. 7:12cv00494 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| **RENA MULLINS,** *et al.*, | ) | By: Norman K. Moon |
| Defendants. | ) | United States District Judge |

Carl D. Gordon, a Virginia inmate proceeding *pro se*, filed this civil rights action pursuant to 42 U.S.C. § 1983, alleging that defendants violated the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1, *et seq.*, and Gordon's constitutional rights following the confiscation of thirty-seven books as excess property while he was housed at Red Onion State Prison ("ROSP"). Defendants have filed a motion for summary judgment ("Motion" or "Motion for Summary Judgment") (docket no. 41) and Gordon has responded thereto. Upon consideration of this action, I will grant defendants' Motion for Summary Judgment.[1]

## I. Background

Pursuant to Virginia Department of Correction ("VDOC") Operating Procedure ("OP") 802.1 and ROSP policy, prisoners at ROSP are allowed to possess up to thirteen books.[2] OP 802.1, Attach. 2 and ROSP Offender Orientation Handbook, p. 31. Permission to keep personal property is "considered a privilege that may be withdrawn," and failure to comply with the OP or facility procedures "may result in forfeiture of personal property privileges." OP 802.1(IV)(J). In the fall of 2010, Gordon possessed fifty books, in violation of OP 802.1 and ROSP policy.

---

[1] By order entered June 14, 2013, I granted Gordon's motion to voluntarily dismiss C. Gilbert as a defendant to this action. Docket No. 37.

[2] Specifically, prisoners may possess twelve books, including study texts and legal references, plus one additional religious text. ROSP Offender Orientation Handbook, p. 31.

Pursuant to OP 802.1, Gordon had the opportunity to voluntarily dispose of his excess property at any time.[3] OP 802.1(VII)(D). However, Gordon did not voluntarily dispose of his excess property and his excess books were discovered by Sergeant Gilbert on November 2, 2010.[4] Upon discovery, Sergeant Gilbert confiscated thirty-seven of Gordon's fifty books and gave Gordon a Notification of Confiscation of Property form that listed the books he confiscated.[5]

OP 802.1 provides that a prisoner has seven days to appeal the confiscation of his personal property through the offender grievance procedure.[6] OP 802.1 (VII)(I). There is no dispute that Gordon timely grieved the confiscation of his property. In his informal complaint, Gordon complained that he did not get to choose all thirteen of the books that he wanted to keep and asked to exchange five of the books that he then possessed for a dictionary and four religious books that were included in the confiscated books. In his regular grievance, Gordon complained that the policy which allows only thirteen books was outdated and argued that he should have

---

[3] The policy governing voluntary disposal of excess property allows a prisoner to send property out by mail or delivery service, have a visitor pick it up, donate it to charity, or have it destroyed. OP 802.1(VII)(D).

[4] Sergeant Gilbert is not a designated personal property officer at ROSP. Each facility designates one or more employees to serve as personal property officers to be responsible for offender personal property. OP 802.1(V). "The personal property officer is responsible for control of offender personal property, including inventory and search of personal property, adding or deleting property, identifying property, disposing of property, and keeping accurate records." *Id.*

[5] The parties dispute whether Gordon was given the opportunity to choose the thirteen books that he would keep out of the fifty he possessed. Defendants allege that upon confiscation, Gordon was given the opportunity to choose the thirteen books, as noted by Sergeant Gilbert on the Notice of Confiscation of Property form. Gordon alleges that he only picked the first eight books, and while picking those eight books, changed his mind a few times and swapped out other books, which frustrated Sergeant Gilbert, who then grabbed five more books randomly, gave them to Gordon, and told him he had his thirteen books. Because Gordon has not established that he had the right under prison policy to choose books during the confiscation, however, the dispute is not material to the disposition of the case.

[6] Pursuant to OP 866.1, before submitting a formal grievance, a prisoner "should demonstrate that he/she has made a good faith effort to resolve the issue informally" which "shall be documented using an Informal Complaint. OP 866.1(V)(B). Thereafter, a prisoner may file a Regular Grievance, for which there are three possible levels of review: Level I review by the Facility Unit Head; Level II review by the Regional Administrator, Health Services Director, Superintendent for Education, or Chief of Operations for Offender Mgmt Service; and Level III by the Chief of Corrections Operations or Director. OP 866.1(VI). Not all issues qualify for Level III review. OP 866.1(VI)(C)(2)(g). In this case, The Level II response to Gordon's appeal indicated that it was the last level of appeal for his grievance.

some of his books returned to him. The Level I response deemed Gordon's Regular Grievance unfounded. Gordon's appeal of the Level I response complained that he did not get to choose all thirteen books and that thirteen books do not sufficiently keep him abreast of constantly changing information about law, religion, rehabilitation, world advancements, etc. The Level II response to Gordon's appeal upheld the Level I response and indicated that it was the last level of appeal for Gordon's grievance.[7]

Pursuant to OP 802.1, if it is verified that the seized property belongs to the prisoner but that he is not authorized to possess it (e.g., it is excess property), the prisoner will be notified by a Property Disposition form and may designate the disposal method by completing and returning the form within five days. Gordon was given a Property Disposition form on November 15, 2010.[8] However, according to defendant Vanover, a ROSP personal property officer, Gordon never returned the form.

Pursuant to OP 802.1, a facility should retain custody of the confiscated property until completion of all grievance appeals and other claims. Once that time expires, any items for which a prisoner does not designate a method of disposal are converted to state ownership and disposed of by the facility. OP 802.1(VII)(E), (I). Gordon's grievance appeal process was completed on December 17, 2010, when he received the Level II response. Gordon did not return a Property Disposition form designating how to dispose of the excess books by the five-day deadline or even by the conclusion of his grievance appeals. According to defendant

---

[7] During this time, Gordon also filed many other Requests for Information, Informal Complaints, and Grievances in which he complained that his books were confiscated without allowing him to choose which thirteen of the books he would keep. Defendants routinely responded to these submissions by stating that Gordon was already given the opportunity to choose the thirteen books he would keep, rejecting the complaints as repetitive, and/or indicating that the issue was already being addressed by Gordon's original grievance process.

[8] Gordon signed a Notification of Confiscation of Property form on this date, which also acknowledged his receipt of the Property Disposition form. The signed form also reminded Gordon that the Property Disposition form must be returned within five days and that failure to return the form would result in disposal of the property by the facility.

Vanover, Gordon's books are no longer at ROSP and "were likely disposed of in accordance with operating procedures." Defs.' Mot. for Summ. J., Def. Vanover Aff., Ex. I ¶ 9. Almost six months later, in a June 2, 2011 Request for Information, Gordon requested a copy of a Property Disposition form that he allegedly submitted after receiving his Level II grievance response on December 17, 2010. Gordon stated that the Property Disposition form which he submitted indicated that he would like his excess books sent to The Quest Institute ("Quest").[9] Thereafter, Gordon filed several additional Requests for Information inquiring as to the status of his excess books and, in response to one of these requests, was told that his books were "dispositioned per [his] request." There is no copy of a completed Property Disposition Form in the record, and defendant Vanover indicates that "there is no documentation in [Gordon's] folder to indicate that he returned the form selecting a method of disposal for his excess books." Defs.' Mot. for Summ. J., Def. Vanover Aff., Ex. I ¶ 9.

Gordon complains that OP 802.1 violates RLUIPA and his First Amendment right to free exercise of religion and that the defendants violated these and other federal rights when: Sergeant Gilbert, and not a designated personal property officer, confiscated his excess property; Gordon was not allowed to exchange five of his books for a dictionary and four religious books; he was not allowed to send his excess books to Quest; some of his grievances and complaints were not logged, were rejected as repetitive, were deemed unfounded, or were upheld on appeal; the defendants retaliated against him for filing grievances and this action; and the defendants conspired to violate his rights by hindering his chances of selling his poems for publication.

---

[9] Quest is a private, non-profit, educational corporation located in Charlottesville, Virginia that operates a program called "Books Behind Bars," which provides free books to inmates and prison libraries. *See* The Quest Institute, http://www.thequestinstitute.org (last visited Mar. 18, 2014).

## II. Standard of Review

Federal Rule of Civil Procedure 56(a) provides that a court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "As to materiality . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In order to preclude summary judgment, the dispute about a material fact must be "'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see also JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). However, if the evidence of a genuine issue of material fact "is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 250. In considering a motion for summary judgment under Rule 56, a court must view the record as a whole and draw all reasonable inferences in the light most favorable to the nonmoving party. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986); *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994).

A court must grant a motion for summary judgment if, after adequate time for discovery, the nonmoving party fails to make a showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. The nonmoving party cannot defeat a properly supported motion for summary judgment with mere conjecture and speculation. *Glover v. Oppleman*, 178 F. Supp. 2d 622, 631 (W.D. Va. 2001) ("Mere speculation by the non-movant cannot create a genuine issue of material fact."). The trial judge has an "affirmative obligation" to "prevent 'factually unsupported claims and defenses' from proceeding to trial." *Id.* (quoting *Celotex*, 477 U.S. at 317).

### III. Validity of OP 802.1's Book Limit Policy

Gordon argues that the VDOC's thirteen-book limit, imposed by OP 802.1, violates his First Amendment right to free exercise of religion and RLUIPA by imposing a substantial burden on his ability to learn, understand, and practice Hare Krishna and Islamic doctrine. I find that Gordon has not demonstrated that any of the defendants were responsible for the establishment or implementation of the relevant portion of OP 802.1, or that it imposes a substantial burden on his religion. Accordingly, I will grant summary judgment as to these claims.

The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend I.; *Cruz v. Beto*, 405 U.S. 319, 322 (1977). To state a free exercise claim under the First Amendment, a plaintiff must allege facts sufficient to show (1) that he holds a sincere belief that is religious in nature and (2) that prison regulations impose a substantial burden on his right to free exercise of religion. *O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987).

RLUIPA prohibits the government from imposing "a substantial burden on the religious exercise" of an inmate unless the government can demonstrate that the burden "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a). The plaintiff bears the initial burden of establishing that the government's actions substantially burdened his exercise of religion. Once such a showing is made, the government bears the burden of persuasion that its practice furthers a compelling government interest in the least restrictive means. *Adkins v. Kaspar,* 393 F.3d 559, 567 n.32 (5th Cir. 2004); *Civil Liberties for Urban Believers v. Chicago,* 342 F.3d 752, 760 (7th Cir. 2003).

A substantial burden on religious exercise occurs when a state or local government "puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Lovelace*

*v. Lee*, 472 F.3d 174, 187 (4th Cir. 2006) (*quoting Thomas v. Review Bd. Of Ind. Employment Sec. Div.*, 450 U.S. 70, 718 (1981), and *Sherbert v. Verner*, 374 U.S. 398 (1963)). In conducting the substantial burden inquiry, the plaintiff "is not required . . . to prove that the exercise at issue is required by or essential to his [or her] religion." *Krieger v. Brown*, 496 F. App'x 322, 325 (4th Cir. 2012) (citing *Cutter v. Wilkinson*, 544 U.S. 709, 725 n.13 (2005)). Nevertheless, "at a minimum the substantial burden test requires that a RLUIPA plaintiff demonstrate that the government's denial of a particular religious . . . observance was more than an inconvenience to one's religious practice." *Smith v. Allen*, 502 F.3d 1255, 1278 (11th Cir. 2007) (citing *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1227 (11th Cir. 2004)). No substantial burden occurs if the government action makes the "religious exercise more expensive or difficult" but does not pressure the adherent to violate his or her religious beliefs or abandon one of the precepts of his or her religion. *Living Water Church of God v. Charter Twp. of Meridian*, 258 F. App'x 729, 739 (6th Cir. 2007).

Although RLUIPA must "be construed in favor of a broad protection of religious exercise," 42 U.S.C. § 2000cc-3(g), it must also be applied "with particular sensitivity to security concerns." *Cutter v. Wilkinson*, 544 U.S. 709, 722 (2005). Courts are required to give "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security, and discipline, consistent with consideration of costs and limited resources." *Id.* at 723. In this regard, "RLUIPA [is not meant] to elevate accommodation of religious observances over an institution's need to maintain order and safety." *Id.* at 722.

Although a prison policy preventing inmates from possessing more than thirteen books at any one time may seem somewhat arbitrary and even counterproductive, neither RLUIPA nor the First Amendment provide a remedy for prisoners unless that policy imposes a substantial burden

on the free exercise of religion. The threshold for showing a substantial burden is high, and Gordon has not shown that the thirteen-book limit in OP 802.1 imposes such a burden on the free exercise of his religious beliefs.

Gordon has not shown that OP 802.1 "puts substantial pressure on [Gordon] to modify his behavior and to violate his beliefs." *See Lovelace*, 472 F.3d at 187. The policy does not limit prisoners to thirteen books through their entire incarceration; rather, it provides that an inmate may possess only thirteen books at any given time. Prisoners are allowed to change the thirteen books whenever they wish, so long as the incoming book complies with other VDOC and facility policies. At most, the thirteen-book limit makes it more inconvenient, difficult, and expensive for Gordon to learn, understand, and practice Hare Krishna and Islamic doctrine. This does not show a substantial burden, and thus does not meet the threshold for either a First Amendment or RLUIPA free exercise claim.[10] Further, Gordon does not allege or demonstrate that any of the named defendants were personally responsible for the establishment or implementation of the policy. Accordingly, I will grant defendants' motion for summary judgment as to these claims.

### IV. Exchanging Books

Gordon alleges that the defendants violated RLUIPA and his constitutional rights to free exercise of religion and due process when they refused to return or have returned to him his confiscated dictionary and four religious books in exchange for five books he no longer wanted. I find that Gordon's allegations do not establish a constitutional or RLUIPA violation and, therefore, will grant summary judgment as to these claims.

Gordon possessed fifty books, in violation of VDOC and ROSP policies. The defendants confiscated thirty-seven of the books to bring Gordon into compliance with the rules. Gordon

---

[10] Since I find Gordon's allegations do not amount to a substantial burden, I need not and do not consider whether his religious beliefs are sincere under the First Amendment, nor whether any burden placed on the exercise of his beliefs passes strict scrutiny under RLUIPA.

8

argues that he chose eight of the thirteen books and that Sergeant Gilbert "randomly" chose the remaining five. Thereafter, the defendants did not allow Gordon to exchange any of the thirteen books for any of the confiscated excess books. However, there is no allegation or evidence that suggests that the defendants would not allow Gordon to exchange any of the thirteen books he now possesses with books from another source that complied with other VDOC and facility policies. Further, Gordon does not allege that he possessed the only copies of the books he sought to exchange. Thus, the only issue is whether the defendants' refusing to exchange for those four specific copies of the religious books violates his rights.

With regard to RLUIPA and his First Amendment right free exercise of religion, I find that Gordon has not demonstrated that the defendants' refusal to exchange those four specific religious books from the pile of confiscated books imposed a substantial burden on his religious exercise. A free exercise claim can only survive, under either provision, if a plaintiff alleges facts sufficient to show prison regulations establish such a substantial burden.[11] As the name suggests, this is not an easy threshold to meet. The Fourth Circuit has said that a substantial burden is imposed on free exercise under RLUIPA "when a state or local government, through act or omission, 'puts substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" *Lovelace v. Lee*, 472 F.3d 174, 187 (4th Cir. 2006) (quoting *Thomas v. Review Bd. of Ind. Employment Sec. Div.*, 450 U.S. 707, 718 (1981)).

A substantial burden must impose more than an inconvenience on a prisoner's right to freely practice his or her religion. *See Smith v. Allen*, 502 F.3d 1255, 1278 (11th Cir. 2007), *abrogated on other grounds by Sossamon v. Texas*, 131 S. Ct. 1651, 1658–59 (2011). For

---

[11] RLUIPA's "legislative history . . . indicates that the term 'substantial burden' as used in [RLUIPA] is not intended to be given any broader interpretation than the Supreme Court's articulation of the concept of substantial burden or religious exercise." *Living Water Church of God v. Charter Twp. of Meridian*, 258 F. App'x 729, 733–34 (6th Cir. 2007) (internal quotation marks omitted) (citing 146 Cong. Rec. S7774–01, 7776 (daily ed. July 27, 2000) (joint statement of Sens. Hatch and Kennedy)).

9

example, in *Smith*, prison officials' decisions placed no more than an incidental burden on an inmate's free exercise of Odinism when the officials limited the inmate to worshipping in a secure area, rather than in an open area of the prison, and to using a candle instead of a fire pit for a religious rite, *Id.* at 1279. In contrast, prison officials imposed a substantial burden on an inmate's free exercise of Islam when they banned him from participation in all Ramadan religious exercises and meal services after he allegedly attempted to break his Ramadan fast by eating during daytime hours. *See Lovelace*, 472 F.3d at 182–83, 187–89.

The United States Supreme Court has also found that plaintiffs face a high hurdle in seeking to show a substantial burden on their free exercise of religion. When state action compels or pressures a religious adherent to "modify his behavior and to violate his beliefs" in order to receive an important benefit, it places a substantial burden on the free exercise of religion. *See, e.g.*, *Thomas v. Review Bd. of Ind. Employment Sec. Div.*, 450 U.S. 707, 717–18 (1981); *Sherbert v. Verner,* 374 U.S. 398, 404 (1963). But when state action only makes a religious practice more difficult or expensive, it does not impose a substantial burden on free exercise. *See, e.g.*, *Lyng v. Nw. Indian Cemetery Protective Ass'n,* 485 U.S. 439, 449 (1988) (finding no substantial burden on Native American religious practices performed on National Forest land where the government allowed road and timber gathering on that same land); *Braunfeld v. Brown,* 366 U.S. 599, 605–06 (1961) (finding state law preventing sale of certain items on Sunday did not burden the practice of Orthodox Judaism, although it made that practice more expensive).

In the instant case, Gordon does not allege a substantial burden was imposed on the free exercise of his religious beliefs under either the First Amendment or RLUIPA because he was not allowed to choose all the books he kept upon confiscation of surplus books, nor because he

was not allowed to later exchange some of the books he kept for books that were confiscated.[12] Defendants did not prevent Gordon from obtaining the confiscated books he wished to get back from another source. *See Living Water Church of God*, 258 F. App'x at 739. Although denying Gordon the ability to choose which books he kept may have made it more difficult, inconvenient, or expensive for him to understand and practice his faith, that does not rise to the level of a substantial burden. Accordingly, I will grant defendants' motion for summary judgment as to these claims.

With regard to his right to due process, I find that Gordon's allegations again do not rise to the level of a constitutional violation. There is no evidence that a policy exists which provides that prison officials should not allow a prisoner to exchange personal property with confiscated property. The intentional or negligent deprivation of personal property by a prison employee acting outside the scope of official policy or custom does not rise to the level of a constitutional violation if the state provides an adequate post-deprivation remedy. *Hudson v. Palmer*, 468 U.S. 517, 533 (1984); *Parratt v. Taylor*, 451 U.S. 527, 545 (1981). In this case, Gordon made use of the institution's post-deprivation remedies by way of the grievance process, and other state law remedies, including the Virginia Tort Claims Act, were and/or are available to Gordon as a means to seek compensation for his books. *See Wadhams v. Procunier*, 772 F.2d 75, 77-78 (4th Cir. 1985); *Balance v. Young*, 130 F. Supp. 2d 762, 767 (W.D. Va. 2000). Inasmuch as Gordon had adequate state remedies, I find that his allegations do not rise to the level of a constitutional violation. Accordingly, I will grant defendants' motion for summary judgment as to this claim.

---

[12] Since I find Gordon's allegations do not amount to a substantial burden, I need not and do not consider whether his religious beliefs are sincere under the First Amendment, nor whether any burden placed on the exercise of his beliefs passes strict scrutiny under RLUIPA.

## V. Sending Books to Quest

Gordon alleges that defendants violated his due process and equal protection rights when they did not allow him to send the excess books to Quest. I find that Gordon has failed to allege a constitutional violation and, therefore, will grant summary judgment as to these claims.

ROSP provides a means for inmates to select the way in which ROSP disposes of confiscated property, through the Property Disposition form. Gordon's excess books were not sent to Quest because he did not return the Property Disposition form within five days, as required by OP 802.1. Gordon signed a form acknowledging his receipt of the Property Disposition form on November 15, 2010. This form also reminded Gordon that he must submit the form within five days if he wished to designate how his excess books would be disposed; otherwise, the property would be "disposed of by the facility."

Gordon alleges that he submitted the Property Disposition form after December 17, 2010. Even assuming Gordon did submit the Property Disposition form (which appears nowhere in the record), he did not follow the procedure prescribed by OP 802.1. Further, OP 802.1 provides that confiscated property becomes property of the state after the grievance process is complete. Inasmuch as Gordon's grievance process was completed on December 17, 2010 and Gordon states that he filed his Property Disposition form after that date, his excess books had already become property of the state. Because Gordon's excess books were not sent to Quest because of his own failure to follow established procedure to designate a means of disposal, I cannot find that the defendants violated Gordon's constitutional rights by not sending the excess books to Quest. Accordingly, I will grant defendants' motion for summary judgment as to these claims.

## VI. Grievances

Gordon alleges that his equal protection and due process rights were violated when the defendants failed to log his grievances, rejected his grievances as repetitive, deemed his

grievances unfounded, and upheld grievance determinations on appeal. Gordon also alleges claims of supervisory liability for failing to instruct staff how to properly handle grievances. I find that Gordon's allegations fail to state a constitutional claim and, therefore, will grant summary judgment as to these claims.

Prison inmates have no federal constitutional right to have any inmate grievance system in operation at the place where they are incarcerated. *See, e.g., Adams v. Rice*, 40 F.3d 72 (4th Cir. 1994) (holding that inmates have no constitutional right to a grievance procedure); *Flick v. Alba*, 932 F.2d 728, 729 (8th Cir. 1991); *Mann v. Adams*, 855 F.2d 639, 640 (9th Cir. 1988); *Brown v. Dodson*, 863 F. Supp. 284, 285 (W.D. Va. 1994). Simply because a state or local authority chooses to establish an inmate grievance system, that choice does not confer any substantive constitutional right on the prison inmates or pre-trial detainees. *See Mann*, 855 F.2d at 640. Even if corrections officials do not properly apply an inmate grievance procedure, as Gordon alleges, such failure is not actionable under § 1983 because violations of prison policies alone are not constitutional deprivations. *Ashann-Ra v. Virginia*, 112 F. Supp. 2d 559, 569 (W.D. Va. 2000), *Keeler v. Pea*, 782 F. Supp. 42, 44 (D.S.C. 1992). Further, it is well settled that there can be no supervisory liability when there is no underlying constitutional injury. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986); *Temkin v. Frederick County Comm'rs*, 945 F.2d 716, 724 (4th Cir 1991); *Kopf v. Wing*, 942 F.2d 265, 269 (4th Cir. 1991); *Belcher v. Oliver*, 898 F.2d 32, 36 (4th Cir. 1990). Therefore, Gordon has no constitutional right to have or utilize the grievance procedure, and has alleged nothing suggesting a violation of his equal protection or due process rights in the operation of existing grievance procedures. Inasmuch as Gordon has no constitutional right to have or utilize the grievance procedure, Gordon's claims of supervisory liability are meritless. Accordingly, I will grant defendants' motion for summary judgment as to these claims.

## VII. Retaliation

Gordon alleges that the defendants retaliated against him for filing grievances and commencing this action. However, I find that Gordon's allegations do not establish a constitutional violation and, therefore, will grant summary judgment as to this claim.

It is well settled that state officials may not retaliate against an inmate for exercising his constitutional rights, including his right to access the courts. *See American Civ. Liberties Union v. Wicomico Cnty.*, 999 F.2d 780, 785 (4th Cir. 1993). In order to sustain a cognizable retaliation claim under § 1983, however, an inmate must point to specific facts supporting his claim of retaliation. *White v. White*, 886 F.2d 721, 723-24 (4th Cir. 1989). "[B]are assertions of retaliation do not establish a claim of constitutional dimension." *Adams*, 40 F.3d at 75 (stating federal courts should regard inmate claims of retaliation with skepticism).

In this case, Gordon does not point to any facts that suggest that the defendants' confiscation of his excess property or handling of the excess property was based on a retaliatory motive. Sergeant Gilbert allegedly did not allow Gordon to choose all thirteen of the books he would keep upon confiscation, but that occurred before Gordon filed any grievance or complaint. Beyond that point, Gordon was given notice and opportunity to control the disposition of his confiscated books, but did not follow the proper procedure to do so. Prison officials would not allow him to swap books he kept with books that were confiscated, but prison policies did not obligate officials to allow that swap. Although the rule itself, the process of confiscation, and the prison appeals process were doubtless frustrating for Gordon, he does not make the specific factual allegations of retaliation required to sustain such a claim. Accordingly, I find that Gordon's conclusory allegation of retaliation fails to state a claim and, therefore, will grant defendants' motion for summary judgment as to this claim.

## VIII. Equal Protection

Gordon alleges that his right to equal protection was violated when property officers were not called to confiscate his excess property, when the defendants did not allow him to pick all thirteen books that he wanted to keep, when the defendants refused to exchange some of his books for some of the confiscated books, and when he was prevented from sending his books to Quest. I find that Gordon has failed to establish that the defendants acted with discriminatory intent or purpose and, therefore, will grant summary judgment as to this claim.

The Equal Protection Clause of the Fourteenth Amendment provides that a state may not "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. To that end, the Equal Protection Clause affords "all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1982). To establish an equal protection violation, a plaintiff must first demonstrate that he has been "treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination"; once this showing is made, the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny. *See Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264-65 (1977) (requiring proof of racially discriminatory intent or purpose to show an equal protection violation); *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001).To succeed on an equal protection claim, a plaintiff must set forth "specific, non-conclusory factual allegations that establish improper motive." *Williams v. Hansen*, 326 F.3d 569, 584 (4th Cir. 2003). Mere conclusory allegations of discrimination are insufficient to state a claim. *Spaulding v. Dixon, et al.*, No. 90-7315, 1990 U.S. App. LEXIS 15560, at *2, 1990 WL 126136, at *1 (4th Cir. Sept. 4, 1990); *Chapman v. Reynolds*, 378 F. Supp. 1137, 1139 (W.D. Va. 1974).

In support of his equal protection claim, Gordon argues that another inmate had fifty-six excess books confiscated a couple months before Gordon's were confiscated, that the confiscation was done by designated personal property officers, that the inmate was allowed to choose the thirteen books that he wanted to keep, and that the inmate was allowed to send his excess books to Quest. Gordon has not established that he was similarly situated to the other inmate. There are many potential reasons for Gordon's disparate treatment compared to the other inmate. Perhaps personal property officers were not available on the day of Gordon's confiscation. The situation with Gordon may have led Sergeant Gilbert to make a quick decision about which books Gordon would keep, where such a decision was not necessary with the other inmate. The other inmate may have filed a Property Disposition form to send his books to Quest within the requisite five-day period after confiscation, as Gordon failed to do. But even if Gordon could demonstrate he was similarly situated to the other inmate, Gordon has not demonstrated that the alleged disparate treatment was the result of intentional or purposeful discrimination. There is simply nothing in the record to suggest an improper motive for the confiscation and Gordon's subsequent treatment. Accordingly, I find that Gordon's equal protection claim fails and will, therefore, grant defendants' motion for summary judgment as to this claim.

## IX. Conspiracy

Gordon alleges that the defendants conspired to hinder his chances of selling poems. In support of this claim, Gordon alleges that he does a "tremendous amount" of legal and creative writing that he is "trying to get published." He argues that the defendants "seriously hindered [his] chances of selling [his] poems to Blue Mountain Arts, probably causing them to be rejected in 2010 and/or early 2011." I find that Gordon's allegations are insufficient to support a constitutional claim and, therefore, will grant summary judgment as to this claim.

16

To establish a civil conspiracy under § 1983, a plaintiff must present evidence that the defendants "acted jointly in concert and that some overt act was done in furtherance of the conspiracy" which resulted in plaintiff's deprivation of a constitutional right. *Hinkle v. City of Clarksburg*, 81 F.3d 416, 421 (4th Cir. 1996). Plaintiff has "a weighty burden to establish a civil rights conspiracy. While [he] need not produce direct evidence of a meeting of the minds, [he] must come forward with specific circumstantial evidence that each member of the alleged conspiracy shared the same conspiratorial objective." *Id.* In other words, a plaintiff's evidence must, at least, reasonably lead to the inference that defendants "positively or tacitly came to a mutual understanding to try to accomplish a common and unlawful plan." *Id.*

As discussed above, Gordon has failed to demonstrate that actions of ROSP officials violated his constitutional rights, as is required to establish a civil conspiracy. Even if officials made the practice of his religion or his authorship and publication of poetry more difficult or expensive, he has not shown their actions resulted in the violation of his constitutional rights. Gordon's conclusory allegations of a conspiracy also fail to establish that any member of this alleged conspiracy intended to do so – that any officials intended or, in common with others, sought to commit an unlawful objective. Accordingly, I will grant defendants' motion for summary judgment as to this claim.

## X.

For the reasons stated, I will GRANT defendants' Motion for Summary Judgment (docket no. 41).

Entered this  20th  day of March, 2014.

NORMAN K. MOON
UNITED STATES DISTRICT JUDGE